UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FABIAN COKE,

                              Plaintiff,

          v.

THE CITY OF NEW YORK, and GREGORY
MULLARKEY, in his individual and official
capacities,

                              Defendants.

---

**COMPLAINT**

No. 25-cv-10391

Jury Trial Demanded

---

Plaintiff Fabian Coke, by his attorneys, the Law Offices of Joel B. Rudin, P.C.,

respectfully alleges, upon information and belief, as follows:

## NATURE OF THE ACTION

1.      This is a civil action, pursuant to 42 U.S.C. §§ 1983 and 1988, New York State

law, and the New York City Administrative Code, seeking monetary damages for the Plaintiff,

Fabian Coke, due to his unlawful arrest and criminal prosecution and conviction for murder, his

pretrial detention and post-conviction imprisonment totaling more than ten years, and his

additional consequential damages.

2.      Late at night in December 2014, a woman was shot and killed on a Bronx street

corner. Based on fingerprints found in an abandoned car believed to be used by the perpetrators,

police arrested Devon Jenkins, who claimed that Brendrick Brown had exited the car and

committed the shooting. Jenkins said nothing to indicate that Coke knew, let alone intended, that

the shooting would occur, and indeed there existed no evidence implicating Coke in the crime.

3.      However, as a result of misconduct, detailed below, by the assigned case detective

of the New York City Police Department ("NYPD"), Defendant Gregory Mullarkey, Coke was

wrongfully prosecuted for and convicted of a murder he had nothing to do with, losing more than a decade of his life to jail and prison.

4.    Mullarkey obtained surveillance video that he believed showed Coke with Jenkins and Brown at a gas station approximately two hours before the shooting occurred. However, he falsely stated in a Criminal Court complaint, and later falsely told a grand jury, that Coke was present with the two men just 40 minutes before the shooting.

5.    Mullarkey also misleadingly omitted from the Criminal Court complaint, and from the grand jury, several pieces of exculpatory information, including that police saw three men driving away from the scene of the shooting and found in the abandoned car the fingerprints of three men—Jenkins, Brown, and a man named Arvey Valderrama—but *not* Coke's fingerprints.

6.    Such reliance on false and misleading statements to initiate prosecutions has long occurred with impunity in the NYPD, leading to numerous wrongful convictions. The toleration of such misconduct by NYPD policymaking officials encouraged its repetition and led directly to the miscarriage of justice that occurred in this case.

7.    In 2025, the New York Appellate Division, First Department, took the extremely rare step of vacating Coke's murder and gun convictions and dismissing the entire indictment with prejudice on the ground that the evidence against Coke had been legally insufficient.

8.    Coke was released from prison after serving ten years and three months in jail and prison for a crime he did not commit.

9.    Coke brings this civil action against Defendant Mullarkey for fabricating evidence against him and initiating his prosecution without probable cause, and also against the City of

New York for the unlawful policies and practices of the NYPD that contributed to causing Coke's wrongful prosecution and conviction and resulting injuries.

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

10.     This action arises under 42 U.S.C. §§ 1983 and 1988 and under the common law of the State of New York.

11.     The acts and omissions giving rise to this complaint occurred in Bronx County.

12.     Plaintiff's damages exceed $25,000.

13.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 and under the principles of pendent jurisdiction.

14.     Venue is proper under 28 U.S.C. § 1391.

15.     This action has been commenced within the applicable period for each claim.

16.     On or about June 3, 2025, Plaintiff served the City of New York timely notice of the present claims, in accordance with N.Y. Gen. Mun. Law § 50-e.

17.     Plaintiff has duly complied with all the conditions precedent to the commencement of this action.

## THE PARTIES

18.     Plaintiff FABIAN COKE is a citizen and resident of the State of New York and of the United States. He resides within the Southern District of New York.

19.     Defendant GREGORY MULLARKEY, Shield Number 5821, Tax ID 922844 was at all relevant times a detective employed by the NYPD, acting within the scope of his authority and under color of state law. He is named here in his individual and official capacities.

20.     Defendant CITY OF NEW YORK is a municipal corporation of the State of New York and is a resident of the Southern District of New York.

**ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

**Dune Jacobs is fatally shot in the Bronx and police conduct an investigation
that points to suspects other than Fabian Coke**

21.     On or about December 2, 2014, at approximately 12:47 a.m., someone shot and killed Dune Jacobs on a street corner in the Bronx, New York.

22.     Police officers who heard the gunshots saw a white Nissan Altima driving in the vicinity and pursued it.

23.     An officer claimed to have observed three people in the Altima.

24.     The officers briefly lost site of the Altima and then found it abandoned in an intersection several blocks away from the site of the shooting.

25.     Inside the Altima, police investigators found fingerprints which they matched to Devon Jenkins, Brendrick Brown, and Arvey Valderrama.

26.     They found no fingerprints belonging to Fabian Coke.

27.     Inside the Altima, investigators also found receipts from various stores.

28.     Based on information in these receipts, investigators obtained surveillance videos from various locations.

29.     On December 5, 2014, detectives obtained a video from a Sunoco gas station.

30.     A time stamp on the video indicated that three men were inside the gas-station store for about three minutes starting at approximately 12:05 a.m. on December 2, 2014.

31.     Investigators alleged these men were Jenkins, Brown, and Coke.

32.     However, the detectives learned that the time stamp on the video was one hour and two minutes fast.

33.     They documented this in a police report they prepared the next day.

34.     Taking into account the error in the time stamp, the detectives had a basis to conclude that the three men were inside the gas-station store for approximately three minutes starting at 11:03 p.m. on December 1, 2014.

35.     As the detectives documented in their police report, the surveillance video shows that shortly after the three men left the gas-station store, a "white four door sedan" drove away from the gas station.

36.     It is not clear in the video what the make or model of this white car is or who is inside the white car.

37.     Investigators interviewed Devon Jenkins.

38.     Jenkins made statements that tended to exculpate Coke.

39.     He told police that Brown told him to drive to a particular location and stop the car, after which Brown exited the car, Jenkins heard multiple shots, and Brown got back in the car and told Jenkins, "go, go, go."

40.     Jenkins did not tell police that Coke did anything to facilitate the shooting or to indicate that he knew the shooting would occur.

41.     The police obtained surveillance video that shows part of the intersection where the shooting occurred.

42.     While the video does not show the shooting, consistent with Jenkins's statement, it appears to show just one individual exiting and then returning to the car.

**Relying on false and misleading statements, Defendant Mullarkey initiates Fabian Coke's prosecution for murder and gun possession charges**

43.     On the night of December 6, 2014, Coke was arrested.

44.     Mullarkey then caused the initiation of Coke's prosecution by providing false, misleading, and incomplete information and documentation to the District Attorney's Office.

45.    Mullarkey swore to a Criminal Court complaint in which he falsely accused Coke of committing murder, manslaughter, and criminal possession of a weapon.

46.    In this Criminal Court complaint, Mullarkey made several more specific, false or misleading statements.

47.    First, Mullarkey stated that a surveillance video showed Coke with Jenkins and "an individual known to the Police Department" (i.e., Brown) at the Sunoco gas station "at approximately 12:05 hours as shown on the time stamp on the video."

48.    If true, this would have meant that Coke was with Jenkins and Brown 42 minutes before the shooting.

49.    But this was false: as noted above, police had learned that the time stamp on the gas-station surveillance video was inaccurate and it was actually 11:03 p.m. when the three men were in the gas station.

50.    This meant that, if the surveillance video did in fact show Coke, he was in Jenkins and Brown's company not 40 minutes before the shooting, but instead nearly two hours before the shooting, with plenty of time for the men to go their separate ways.

51.    Second, Mullarkey stated in the Criminal Court complaint that the gas-station surveillance video showed the three men leaving the store together, "after which a white Nissan Altima is observed driving away from said convenience store."

52.    Mullarkey implied that the three men, including Coke, were in the Altima when it drove away.

53.    In fact, while the surveillance video shows a white car, the make and model of the car are not clear and it is impossible to tell who is inside it.

54.     Third, Mullarkey stated in the Criminal Court complaint that Jenkins was driving the Altima when "one of the passengers of the vehicle exited said vehicle and shot Dune Jacobs," causing her death.

55.     Mullarkey misleadingly omitted that Jenkins had specifically identified *Brown* as the person who had exited the car and fired gunshots and that Jenkins had not reported that Coke ever did or said anything to further the crime or even knew it would occur.

56.     Mullarkey falsely alleged that Coke "acted with intent to cause the death" of Jacobs and in fact did so, even though Mullarkey had no evidence of this.

57.     Mullarkey further falsely stated that Coke had committed criminal possession of a weapon in the second degree, even though Mullarkey had no evidence that Coke had possessed any weapon.

58.     As a result of Mullarkey's false and misleading statements in the Criminal Court complaint, Coke's prosecution was initiated without probable cause.

59.     Also as a result of Mullarkey's false and misleading statements, the court ordered Coke to be detained without bail pending trial.

### Two grand juries are misled into indicting Fabian Coke

60.     On or about December 11, 2014, a grand jury was misled into indicting Coke on one count of murder in the second degree, one count of manslaughter in the first degree, and one count of criminal possession of a weapon in the second degree.

61.     The grand jury was informed that a police officer had seen three people in the car believed to be used in the shooting.

62.     But the grand jury was *not* informed that the fingerprints of Jenkins, Brown, and Valderrama had been found in the car, while Coke's fingerprints had *not* been found in the car.

63.    A Justice of Bronx Supreme Court dismissed the indictment on the ground that the evidence against Coke was legally insufficient.

64.    On or about December 15, 2016, the District Attorney presented evidence to a second grand jury.

65.    Mullarkey was called to testify and made several more false or misleading statements.

66.    As he had falsely stated in his Criminal Court complaint, Mullarkey falsely told the grand jury that a surveillance video showed Coke at a gas station with Jenkins and Brown at 12:05 a.m.

67.    The prosecutor then pointedly asked, "So within an hour of your homicide?" and Mullarkey responded, "Yes."

68.    As noted above, the truth was that this surveillance video showed events that occurred nearly *two hours* before the homicide.

69.    Mullarkey testified that a still photo created from the surveillance video showed a white car.

70.    Mullarkey then testified that the white car seen in surveillance video was "the same white car that [he] observed on the night that [he] responded to the homicide."

71.    This was misleading at best, as there was no way to confirm that they were the same car.

72.    But the grand jury was left to wrongly infer that Mullarkey had some information confirming that the car in the video and the car allegedly abandoned by the perpetrators were the "same" car.

73. Mullarkey also omitted that the gas-station surveillance video does not show anyone, including the person alleged to be Coke, getting into the white car.

74. Mullarkey testified that Jenkins was arrested and that "[a]fter Mr. Jenkins was placed into custody," Mullarkey began looking for Coke.

75. This falsely and improperly implied to the grand jurors that Jenkins had accused Coke as being responsible for the shooting when in fact Jenkins had not.

76. The grand jury was informed that a police officer had seen three people in the car believed to be used in the shooting, and that Jenkins's and Brown's fingerprints had been found inside the car.

77. But the grand jury was not informed that the fingerprints of a third person, Arvey Valderrama, also had been found in the car, while Coke's fingerprints had *not* been found in the car.

78. Misled in all the above ways, the grand jury indicted Coke on one count of murder in the second degree, one count of manslaughter in the first degree, and one count of criminal possession of a weapon in the second degree.

79. In July and August 2017, Coke was jointly tried with Jenkins and Brown.

80. On August 2, 2017, the jury found Coke guilty of second-degree murder and second-degree criminal possession of a weapon.

81. The court sentenced Coke to 25 years to life in prison.

### The New York Appellate Division vacates Coke's convictions and dismisses the indictment with prejudice

82. On March 6, 2025, the New York Appellate Division, Second Department, vacated Coke's convictions on both counts and dismissed the entire indictment with prejudice.

83.     It found that the evidence against Coke was legally insufficient in that even giving the prosecution the benefit of all reasonable inferences from the evidence, no rational juror could find that the evidence proved his guilt.

84.     The court held that there was "no evidence from which to infer that defendant had the intent to commit, or aid Jenkins or Brown in furtherance of, the shooting. . . . This case contains no physical, video, or testimonial proof regarding any act defendant took in furtherance of possessing the gun or shooting Ms. Jacobs."

85.     The court also held that there was "no legally sufficient evidence proving that defendant was present at the crime scene" at all.

86.     The court noted that

> [v]ideo from the Sunoco gas station convenience store shows the same hooded man [i.e., the man whom the People alleged was Coke], Jenkins, and a third person the People contend was Brown enter and leave together, *at approximately 11:00 p.m., about two hours before the shooting*. Significantly, none of the surveillance footage shows defendant in, entering, or exiting the Nissan. Nor was there any direct testimony which placed the defendant in the Nissan. The People presented no evidence regarding defendant's whereabouts during the period between the Sunoco video footage, at approximately 11:00 p.m., and the shooting at approximately 1:00 a.m. (emphasis added).

87.     The court concluded:

> [A]ssuming that defendant was with Jenkins and Brown hours prior to the shooting does not permit any reasonable inference that he was with them at the crime scene. There is no evidence that defendant ever entered the Nissan. Nor was there evidence that he was present in the Nissan at the time of the chase. While police recovered from the Nissan fingerprints of Jenkins, Brown, and that of a third unidentified back seat passenger, they did not recover defendant's prints.

88.     Finally, the court noted that "the People presented no evidence as to the motive behind the shooting, or to any connection at all between defendant or Ms. Jacobs."

89.     The court's dismissal of the case terminated it in Coke's favor.

10

90.    Before this favorable termination of his prosecution occurred, Fabian Coke spent ten years and three months in jail or prison.

## FIRST CAUSE OF ACTION

### Malicious prosecution under New York state law

### All defendants

91.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

92.    Defendant Mullarkey, acting individually and in concert with others, acted knowingly, willfully, intentionally, and with actual malice to initiate and/or to continue criminal proceedings against Plaintiff.

93.    He did so without probable cause and intentionally caused Plaintiff to be deprived of his liberty.

94.    The proceedings terminated in Plaintiff's favor.

95.    Defendant City of New York is liable for Plaintiff's prosecution and damages under the principle of *respondeat superior*.

## SECOND CAUSE OF ACTION

### Malicious prosecution in violation of the Fourth, Fifth, and Fourteenth Amendments under 42 U.S.C. § 1983

### Defendant Mullarkey

96.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

97.    Defendant Mullarkey is liable for his violations of Plaintiff's constitutional rights, and all of Plaintiff's resulting damages, under 42 U.S.C. § 1983 and the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

11

## THIRD CAUSE OF ACTION

**Evidence fabrication in violation of the Fourth, Fifth, Sixth,
and Fourteenth Amendments under 42 U.S.C. § 1983**

**Defendant Mullarkey**

98.     Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

99.     Defendant Mullarkey, acting individually and/or in concert with others, acted deliberately, willfully, recklessly, and/or with deliberate indifference to the truth, to fabricate or manufacture false or materially misleading documentary evidence implicating Plaintiff in the crime.

100.    The evidence he fabricated or manufactured includes but is not limited to his statements in his Criminal Court complaint. *See* ¶¶ 44–58, *supra*.

101.    Defendant Mullarkey forwarded or caused the forwarding of such fabricated or manufactured evidence to prosecutors for use against Plaintiff during a criminal prosecution.

102.    Defendant Mullarkey knew the fabricated or manufactured evidence would be likely to influence a jury's decision at trial.

103.    As a result of Defendant Mullarkey's forwarding of the fabricated or manufactured evidence to prosecutors, the latter initiated a criminal prosecution of Plaintiff and he lost his liberty.

104.    Defendant Mullarkey's misconduct violated Plaintiff's right to be free from unreasonable seizure, as guaranteed by the Fourth Amendment to the United States Constitution, and his rights to procedural and substantive due process and a fair trial, as guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

105.    The above misconduct was outrageous and shocking to the conscience.

12

106.    Defendant Mullarkey is liable for his violation of Plaintiff's constitutional rights,

and all of Plaintiff's resulting damages, under 42 U.S.C. § 1983.

### FOURTH CAUSE OF ACTION

**Withholding of exculpatory evidence that was shocking to the
conscience and caused Plaintiff's loss of liberty, in violation of
the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments
("*Russo* Claim") under 42 U.S.C. § 1983**

**Defendant Mullarkey**

107.    Plaintiff repeats and realleges each allegation contained in the preceding

paragraphs as if fully set forth herein.

108.    Defendant Mullarkey knew that Plaintiff's prosecution, including Plaintiff's

pretrial detention in lieu of bail on murder and related charges, was based upon extremely weak

evidence.

109.    Defendant Mullarkey also knew or should have known that, under New York law,

the strength of the prosecution's case was a significant bail factor and that the court likely would

have released Plaintiff on a reasonable bail had it known just how weak the evidence against

Plaintiff was.

110.    Yet Defendant Mullarkey unconscionably withheld from the court, prosecutors,

and the defense numerous pieces of information—some of which are discussed in the preceding

allegations—that showed how weak the evidence against Plaintiff was, thus causing Plaintiff's

unjustified detention.

111.    This conduct was shocking to the conscience.

112.    It violated Plaintiff's constitutional rights to be free of unlawful or unreasonable

seizure under the Fourth and Fourteenth Amendments, to reasonable bail under the Eighth and

Fourteenth Amendments, and to due process of law under the Fifth and Fourteenth Amendments.

13

113.    Defendant Mullarkey is liable for his violation of Plaintiff's constitutional rights, and all of Plaintiff's resulting damages, under 42 U.S.C. § 1983.

## FIFTH CAUSE OF ACTION

### Violations of rights under N.Y.C. Admin. Code §§ 8-802–8-803

### All Defendants

114.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

115.    Pursuant to N.Y.C. Administrative Code §§ 8-802–8-803, Defendant Mullarkey and his employer, the City of New York, are liable for their aforementioned violations of Plaintiff's rights, for his actual damages, for punitive damages, and for his costs and legal fees incurred in the prosecution of this action.

## SIXTH CAUSE OF ACTION

### Municipal liability for the conduct of employees of the NYPD under 42 U.S.C. § 1983 and *Monell*

### Defendant City of New York

116.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

117.    The Police Commissioner and police officers employed by the NYPD are agents and employees of Defendant City of New York.

118.    Under the principles of municipal liability for federal civil rights violations, the City's Police Commissioner or his authorized delegates, during all times relevant to this Complaint, had final responsibility for training, instructing, supervising, and disciplining police officers and other employees of the NYPD with respect to the investigation and prosecution of criminal matters.

14

119.    The particular areas in which the Police Commissioner or his authorized delegates were responsible for training, instructing, supervising, and disciplining police officers and other employees of the NYPD included but were not limited to:

    a.    the constitutional obligation, pursuant to the Fourth, Fifth, and Fourteenth Amendments to the Constitution, not to initiate or continue a prosecution, and to cause a criminal defendant's deprivation of liberty, without probable cause;

    b.    the constitutional obligation, pursuant to the Fourth, Fifth, Sixth, and Fourteenth Amendments, not to fabricate or manufacture evidence, including false or unreliable identifications and false or materially misleading or incomplete reports, for use against criminal suspects and defendants in criminal prosecutions and trials;

    c.    the constitutional obligation, pursuant to the Fifth, Sixth, and Fourteenth Amendments, to make timely disclosure of exculpatory or impeachment evidence to the prosecution for disclosure in turn to a criminal defendant for use during pretrial proceedings and at trial; and

    d.    the constitutional obligation not to give false or misleading testimony.

120.    During all times material to this complaint, the City, through its policymaking officials in the NYPD, owed a duty to the public at large and to Plaintiff to implement policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by NYPD employees that would result in the violation of the above-mentioned constitutional obligations.

121.    These policymakers knowingly and intentionally breached, or were deliberately indifferent to, this duty.

122.    Furthermore, these policymakers created substantial incentives for their employees to commit the above-described constitutional violations, by pressuring police officers to close cases through arrests, indictments, and convictions.

123.    The aforesaid deliberate or de facto policies, procedures, regulations, practices, and/or customs (including the failure to properly instruct, train, supervise, and/or discipline

employees) were implemented or tolerated by policymaking officials for Defendant City—

including but not limited to the Police Commissioner—who knew, or should have known:

a.   to a moral certainty that such policies, procedures, regulations, practices, and/or customs concerned issues that regularly arose in the investigation of criminal cases;

b.   that such issues presented NYPD employees with difficult choices of the sort that instruction, training, supervision, and discipline would make less difficult;

c.   that NYPD employees facing such issues had strong incentives to make the wrong choices, especially given the pressure placed on NYPD employees to make arrests, close cases, and secure indictments and convictions;

d.   that NYPD employees had a history of making wrong choices in such matters; and

e.   that the wrong choice by NYPD employees concerning such issues would frequently cause the deprivation of the constitutional rights of an accused person and cause him constitutional injury.

124.   At the time of Plaintiff's arrest and prosecution, NYPD policymaking officials were on notice of the risk of misconduct by NYPD employees that would violate the constitutional obligations identified in ¶ 118, based on the following circumstances, among others:

a.   credible allegations, many substantiated by judicial decisions, that NYPD detectives had wrongfully withheld material evidence, manufactured false or unreliable identification evidence and other evidence, and/or knowingly given false or misleading testimony;

b.   civil lawsuits, some of which resulted in substantial civil settlements, credibly alleging that NYPD detectives had falsified, exaggerated, or withheld material evidence, or conducted searches or made arrests without probable cause;

c.   numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division discussing the difficult issues that regularly arise for police officers under *Brady*, during eyewitness-identification procedures, and in other phases of criminal investigations;

16

d.  judicial decisions directly criticizing the NYPD for failing to train and supervise officers in their *Brady* obligations and for failing to adopt adequate *Brady* disclosure policies, *see, e.g.*, *Carter v. Harrison*, 612 F. Supp. 749 (E.D.N.Y. 1985) (McLaughlin, J., adopting the Report and Recommendation of then–M.J. Scheindlin), and putting the NYPD on notice that the City could be held liable for its failure to adequately train police officers regarding their obligations to provide truthful testimony and to disclose evidence that favors criminal defendants under *Brady*, *see Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992), and *Carter*, 612 F. Supp 749;

e.  formal reports of the New York City Comptroller's Office and the Bar Association of the City of New York criticizing the NYPD and the New York City Law Department for failing to follow up substantial civil settlements for police misconduct with disciplinary or other remedial action;

f.  the 1994 Mollen Commission Report, based on a two-year investigation and a year of hearings, finding a "culture of corruption" in the NYPD, pervasive misconduct by NYPD officers and detectives including the fabrication of evidence and testimony, and tolerance of this culture and misconduct by the NYPD's leaders; and

g.  the inherent obviousness of the need to train, supervise, and discipline police officers in such obligations to counteract the pressure on officers to close cases and to obtain arrests and convictions.

125.    Many of the aforementioned unlawful practices, their toleration by police policymakers, and the culture of corruption that ensued, were documented well before Plaintiff's prosecution and conviction, in the aforementioned Mollen Commission Report.

126.    The Mollen Commission was formed in 1992 after widespread reports of police corruption, including, among other things, the fabricating of evidence in criminal investigations.

127.    The Mollen Commission "interviewed scores of former and current police officers and supervisors." Mollen Commission Report at 36. It found that

> [o]fficers . . . commit falsification to serve what they perceive to be "legitimate" law enforcement ends—and for ends that many honest and corrupt officers alike stubbornly defend as correct. In their view, regardless of the legality of the arrest, the defendant is in fact guilty and ought to be arrested. Officers reported a litany of manufactured tales.

17

> . . . .
>
> . . . Frustrated by what they perceive to be unrealistic rules of law and by their own inability to stem the crime in their precincts through legal means, officers take the law into their own hands. And police falsification is the result.

*Id.* at 38.

128.   The report noted: "Several officers . . . told us that the practice of police falsification . . . is so common in certain precincts that it has spawned its own word: 'testilying.'" *Id.* at 36.

129.   In one NYPD unit, the Commission found that "the unit's commanding officer not only tolerated, but encouraged, th[e] unlawful practice" of "falsif[ying] documents" and "committ[ing] testimonial perjury." *Id.* at 39.

130.   The Commission concluded that there existed

> a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justified, even if unlawful. . . . This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."

*Id.* at 41.

131.   The Commission also noted that

> the Department's top commanders must share the blame. . . . We are not aware of a single instance in which a supervisor or commander has been sanctioned for permitting perjury or falsification on their watch.
>
> Nor do we know of a single, self-initiated Internal Affairs Division investigation into patterns of police perjury and falsification. . . . Internal Affairs over the last decade had no record of the number of falsification allegations brought against officers throughout the Department or in a particular precinct or command. There is no evidence that anyone in the Department's chain of command had focused on eliminating this practice, including past Police Commissioners and Internal Affairs chiefs, *who*

> *apparently turned a blind eye to unlawful practices that were purportedly*
> *committed to fight crime and increase arrest statistics.*

*Id.* at 41-42 (emphasis added).

132. Despite the revelations of the Mollen Commission Report, the types of constitutional violations documented in the report persisted in the following years, with little to no effort by NYPD policymaking officials to address them.

133. Two detectives whose repeated misconduct NYPD policymaking officials repeatedly turned a blind eye to were Louis Scarcella and Stephen Chmil.

134. In 1988, in the murder prosecution of James Jenkins, Brooklyn Supreme Court Justice Francis X. Egitto found, after a hearing, that the "pretrial identification procedures employed by [Scarcella] were unduly suggestive and prejudicial to defendant."

135. The decision detailed how Scarcella, in violation of police practice and constitutional requirements, had shown a single photo of Jenkins to two witnesses instead of a photo array.

136. It also detailed how, upon Jenkins's arrest, Scarcella had brought five witnesses to the precinct and conducted the following improper identification procedure:

> The witnesses were not separated prior to viewing defendant. Indeed, they were individually and collectively told by Detective Scarcella that "we arrested the man we believe was responsible for the death of the deceased; I would like you to take a look at him." After each witness individually viewed the defendant through a two-way mirror, that witness was returned to the room where his fellow witnesses waited. No effort was made to keep the witnesses from discussing their viewing of defendant who was observed, alone, in a room.

137. The court concluded:

> The practices here utilized represent *a classic illustration of what not to do in conducting pretrial identification procedures*. It was unnecessary to display to the witnesses a single photo; no exigent circumstances justified a showup; and no argument can be advanced to support Detective Scarcella's telling the witnesses that the police had "arrested the man we believe was

19

responsible for the death of the deceased." Based upon this *abysmal showing, and the Police's patent disregard for accepted identification procedures*, the court is left no choice but to exclude from trial all mention of such practices [emphasis added].

138.    Notwithstanding Justice Egitto's harsh criticism, the NYPD conducted no investigation of Scarcella and took no disciplinary action against him.

139.    In 1990, David Ranta was charged with murder in the high-profile shooting death of a beloved Orthodox rabbi earlier that year.

140.    Scarcella and his frequent partner Chmil were assigned to investigate the killing.

141.    At a pretrial hearing, Scarcella testified that several months after the shooting, he spoke to a man named Alan Bloom, who had been arrested near the shooting location.

142.    Bloom was facing numerous robbery charges and many years in prison and was incarcerated at Rikers Island.

143.    Scarcella testified that Bloom had implicated men by the names of David and Steve but did not give last names.

144.    Scarcella testified that he then located photos of David Ranta and Steve Sicar, placed them in a photo array or photo arrays, and showed them to Bloom, who identified both men as having participated in the shooting.

145.    At the hearing, Justice Egitto expressed his incredulity:

> I'm still interested when a person gets arrested, when we have a police officer who tells us the name Steve comes up and he goes ahead to the Catch Unit and picks out a picture of Ranta and Steve when nobody told him Steve's last name. I don't know if he's a medium of some kind. He also picked out the name of Ranta before anyone told him Ranta's last name. From what I gather he heard the name David. Lo[] and behold they are the right people.
>
> It stretches the credulity of the court in how these pictures are obtained.

20

146.    Scarcella and Chmil also manufactured at least one lineup identification of Ranta by blatantly suggesting to a witness whom he should pick.

147.    When an audio recording of the lineup came to light at trial, the defense alleged on the record that the recording established the detectives' misconduct during the lineup.

148.    Justice Egitto again admonished Scarcella, and now Chmil too, on the record:

> The more I hear this the more I am disillusioned with the work of the detectives.
>
> Here a young man of 14, 15 years of age says specifically I *think* it is number three. The cop, probably Scarcella or Chmil, says, okay, number three. From there on in the kid goes along with the number three . . . .
>
> He said, I *think* it is number three, which is not identifying any one [emphasis added].

149.    This witness later revealed that a detective had told him to "pick the guy with the big nose."

150.    Justice Egitto made the following additional remarks about Scarcella's and Chmil's conduct during the Ranta investigation:

> I think what they have done in this case, in my opinion, is decide that Mr. Ranta was the person, the guilty party, and then they went out of their way to make sure it tied up neatly in a package.
>
> . . . .
>
> [T]hey decide the case and that is the reason why a lot of our cases are being blown out when the People only have the police officers to rely upon for their statements, such as narcotics cases and gun cases. The detectives have to be taught here in New York State, unlike a lot of other places, we have a constitution. And they have to live up to it. . . . I think it is ridiculous the way cops take it upon themselves to be judge, jury, and partial executioner.
>
> . . . .
>
> I tell you this. In my opinion throughout this case the two detectives did all they could to tie it up in a neat package. . . . I don't think what they did and the manner in which they did it was, shall we say, absolutely fair.

151. As a result of Scarcella's and Chmil's misconduct, Ranta was convicted.

152. Despite Justice Egitto's comments, the NYPD conducted no meaningful investigation of their misconduct and took no meaningful action to discipline them.

153. As a result, Ranta remained in prison until the DA's Office finally moved to vacate Ranta's conviction in 2013, after the *New York Times* exposed the misconduct of Scarcella and Chmil in numerous cases, including the Ranta case.

154. NYPD policymakers also knew or should have known that in six different homicide prosecutions, Scarcella had used the false and inherently unbelievable "eyewitness" identifications of suspects by a single witness, Teresa Gomez, who was addicted to crack cocaine and engaged in prostitution.

155. In these and numerous other cases, Scarcella and Chmil pressured people addicted to drugs, who were highly susceptible to police pressure, to provide false evidence, or the detectives used unlawful means to coerce or fabricate confessions and false identification evidence.

156. As a result of Scarcella's and Chmil's misconduct, numerous people were wrongfully convicted; many of them did not see their convictions vacated until decades later and some of them still sit in prison as a result of these detectives' misconduct.

157. Scarcella was open about his attitude, saying: "Are there rules when it comes to homicide? No. No, there are none. I lie to them. I will use deception. The bad guys don't play by the rules when they kill Ma and Pop, shoot them in the head, ruin the lives of their family. I don't play by the rules."

158. One judge stated in overturning a conviction that Scarcella secured through his misconduct:

> The findings of this court are that *the assigned Detective, Louis Scarcella, was at the time of the investigation [in 1991] engaged in false and misleading practices*. The cases of David Ranta, Derrick Hamilton, Robert Hill, Alvena Jennette and Darryl Austin that were investigated by Scarcella and prosecuted contemporaneously with this case in the early nineties demonstrate this *pattern and practice. The pattern and practice of Scarcella's conduct which manifest a disregard for rules, law and the truth* undermines our judicial system and gives cause for a new review of the evidence.

*People v. Hargrove*, 49 Misc.3d 1208(A), at *8 (N.Y. Sup. Ct. Kings Cty. 2015) (emphasis added), *aff'd*, 162 A.D.3d 25 (2d Dep't 2018).

159.    After the *Hargrove* decision was issued in 2015, several more cases involving Scarcella were overturned based on his involvement in the police investigations.

160.    Based on the pervasive misconduct by Scarcella and Chmil in the above cases, and others, NYPD policymaking officials knew or should have known that the detectives were coercing confessions, manufacturing false or unreliable identification evidence, intentionally securing testimony that they knew to be false, giving false testimony themselves, and suppressing evidence favorable to criminal defendants which they knew they were obligated to disclose.

161.    Yet these policymaking officials failed to take meaningful steps to supervise or discipline Scarcella or Chmil to ensure that such misconduct did not continue.

162.    Instead, the NYPD treated Scarcella and Chmil as heroes for obtaining arrests and convictions at a blistering rate, thus sending a clear message to the entire NYPD police force that such misconduct would be not just tolerated but celebrated.

163.    Another of the many homicide detectives who engaged in repeated misconduct to which NYPD policymakers were deliberately indifferent was Michael Race.

164.    Race admitted that he investigated 750 murder cases but only one was "done the correct way, from A to Z."

23

165.    An NYPD colleague testified that Race

> had a reputation among detectives for feeding informants and witnesses details about crimes [and] that Race had a reputation of referring informants and witnesses to the TIPS hotline so they could collect rewards for information, which is a violation of police procedure because of the risk of kickbacks.

*Blake v. Race*, 487 F. Supp. 2d 187, 204 (E.D.N.Y. 2007).

166.    In the early 1990s, Race fed details to an informant, Dana Garner, and caused Garner to provide false statements and testimony leading to the arrests and prosecutions of Jeffrey Blake, Ruben Ortega, and Timothy Crosby.

167.    As a result of Garner's testimony, Blake was convicted of murder and sentenced to 36 years to life in prison, Ortega was convicted of murder and sentenced to 25 years to life in prison, and Crosby was convicted of felony assault and sentenced to 10 years to life in prison.

168.    In 1998, the KCDAO conceded that Garner was an unreliable witness and consented to the vacatur of Blake's conviction.

169.    In 1999, Garner signed a sworn statement recanting his accusations against Ortega and Crosby.

170.    That same year, a state judge vacated Crosby's conviction after finding Garner to be "a completely unreliable witness."

171.    In 2003, the Second Circuit vacated Ortega's conviction based on the unreliability of Garner's testimony.

172.    During civil litigation after Blake's conviction was vacated, Garner testified that Race had fed him the details that he provided in his statements to law enforcement and his eventual testimony in the Blake and Ortega cases, and that Race had threatened to charge him with crimes if he didn't implicate Blake and Ortega.

24

173. Garner further testified that, during a lineup in the Blake case, a detective (he claimed he could not remember which one but knew that Race was at least present at the lineup) had told him to "just point out Jeffrey Blake." When Garner hesitated, the detective said, "I know you see him, just go ahead and point him out," and claimed Garner was "looking in [Blake's] direction . . . leaning in his direction."

174. Despite Garner's evident unreliability as a witness and Race's reputation among his NYPD colleagues for feeding witnesses details about crimes, NYPD policymaking officials made no meaningful efforts to scrutinize Race's conduct in these investigations.

175. Another case that illustrates the pattern of misconduct to which NYPD policymaking officials were deliberately indifferent is that of Zaher Zahrey.

176. From 1994 to 1996, various senior detectives from the NYPD's Internal Affairs Bureau ("IAB") tried to frame Zahrey, an NYPD detective whom they suspected of being corrupt, for drug-related crimes including murder.

177. The initially-assigned detective, Sgt. Robert Boyce, tape-recorded himself encouraging a state prisoner, Sidney Quick—whom Boyce knew to be serial robber and murderer addicted to crack—to adopt a false story that Boyce suggested to him implicating Zahrey in a series of murders, robberies, and drug deals.

178. Boyce knew the story was false because it contradicted Quick's prior statements as well as independent police investigation.

179. Boyce improperly promised to give Quick a "very, very, very sweet deal" and to "drive [Quick] home" if, contrary to Quick's prior statements, he'd "nail [Zahrey] to a cross" by accusing Zahrey of being present for and participating in these crimes.

25

180.    Later, when other IAB detectives could not corroborate Quick's manufactured claims, they convinced the United States Attorney's Office in Brooklyn to take over the case by concealing from that office the Quick audio recording.

181.    While Quick was refusing to cooperate with the federal authorities, the assigned IAB detective worked with a prosecutor from the KCDAO, Teresa Corrigan, to use secret coercion and under-the-table promises to induce Quick into agreeing to testify.

182.    Zahrey ultimately was acquitted after Boyce's investigative misconduct was exposed, but not until Zahrey had spent nearly nine months in jail on the false charges.

183.    Zahrey also was acquitted by an NYPD administrative judge who found that Boyce had led Quick to manufacture false allegations, a finding that was ratified by the Police Commissioner.

184.    Numerous articles appeared in *New York Times*, *New York* magazine, and other news media outlets exposing Boyce's misconduct.

185.    Yet despite the Police Commissioner's decision finding that Boyce committed misconduct by manufacturing a false case against Det. Zahrey, and despite all these news articles, NYPD policymakers continually promoted Boyce and eventually made him Chief of Detectives for the entire department.

186.    None of the other IAB personnel involved in the Zahrey case were disciplined either; instead, most were promoted.

187.    NYPD detectives also committed misconduct to obtain a corrupt murder conviction in 1995 in the Jabbar Collins case.

188.    Based upon an anonymous tip, Brooklyn detectives suspected Collins of having committed the botched robbery-murder of an Orthodox rabbi in 1994 in Williamsburg.

26

189.    The assigned homicide detective, Vincent Gerecitano, refused to accept the statements of a witness, Edwin Oliva—who was addicted and heroin and had just been arrested for an unrelated robbery in the same building where the rabbi's murder occurred—that he didn't know anything about the murder in question.

190.    Gerecitano detained Oliva, who was addicted to heroin, while he was going through withdrawal and was drooling, crying, exhausted, and desperate.

191.    Gerecitano coerced Oliva into signing a sworn written statement implicating Collins by refusing to summon medical assistance for Oliva while simultaneously promising Oliva that he would assist him in obtaining leniency from the KCDAO.

192.    Gerecitano omitted all these circumstances from his written police reports and never disclosed them to prosecutors.

193.    Later, before trial, Oliva recanted his coerced written statement, but prosecutors, evidently unaware of how Gerecitano had coerced Oliva's original sworn written statement, brought in Gerecitano to pressure Oliva to recant his recantation.

194.    Ultimately, in 2010, after Collins had spent 16 years in prison, prosecutors revealed Oliva's recantation, a federal judge ordered Collins released, and all charges were dismissed.

195.    Until 2010, the NYPD had no policy, practice, or procedure to learn about and investigate the considerable number of yearly lawsuits alleging police misconduct, settlements of such lawsuits, or judicial findings of improper or illegal police behavior.

196.    This was even though, since 1992, the NYPD had been admonished by two different New York City Comptrollers, as well as the Bar Association of the City of New York, to impose discipline on officers involved in settled civil cases in which constitutional violations

were alleged, and to institute new training and/or other remedial action in response to such claims.

197.    In a 1992 report, then-Comptroller Elizabeth Holtzman recommended that the NYPD "monitor claims and lawsuits involving charges of police misconduct in addition to complaints filed with the Civilian Complaint Review Board and correlate the data from all three sources," and to "use the data from claims and lawsuits, as well as civilian complaints, to identify and correct problems in training or other procedures and policies; and identify individual police officers and take appropriate follow-up action, including additional training or other assistance" in order to "improve the functioning of the NYPD."

198.    In a 1999 report, then-Comptroller Alan Hevesi recommended that the City "[r]eview settled claims data," and re-train and discipline officers accordingly.

199.    In a 2000 report, the Association of the Bar of the City of New York concluded that the City's "policy" of failing to re-train or discipline officers involved in settled civil rights lawsuits "has resulted in a situation in which the City consistently misses opportunities to increase the protection of the rights of persons in the City."

200.    The NYPD took no official action in response to any of these reports and recommendations.

201.    In a report issued in 2010, then-Comptroller John Liu reported that in the 2009-2010 fiscal year, the City had, for the first time, paid out more money for lawsuits against the NYPD than against any other City agency. He again recommended that the NYPD monitor incidents and practices that would give rise to claims.

202.    In the following civil rights lawsuits, the City paid substantial monetary settlements to plaintiffs for their claims that NYPD officers manufactured evidence, gave false

28

testimony or statements, initiated prosecutions without probable cause, or otherwise violated the

constitutional rights of the accused:

a.    *Gallo v. City of New York, et al.*, 95-cv-2105 (E.D.N.Y.) (settled 7/5/94, $13,334). Plaintiff arrested for robbery without probable cause; charges subsequently dismissed.

b.    *Gallion v. City of New York, et al.*, 93-cv-5180 (S.D.N.Y.) (settled 7/18/94, $25,000). Plaintiff arrested without probable cause; charges were dismissed.

c.    *Nakajima, et al. v. City of New York, et al.*, 94-cv-857 (E.D.N.Y.) (settled 3/8/95, $51,000). Two plaintiffs arrested without probable cause, while driving in rental car, despite providing a valid rental agreement.

d.    *Tong v. City of New York, et al.*, 95-cv-7965 (S.D.N.Y.) (settled 10/4/95, $35,000). Plaintiff arrested and strip searched for traffic violation, which was later dismissed.

e.    *Lopez, et al., v. City of New York, et al.*, 93-cv-6516 (S.D.N.Y.) (settled 1/2/96, $80,000). Two plaintiffs were arrested without probable cause and unlawfully strip searched; district attorney declined to prosecute.

f.    *Dabbah v. City of New York, et al.*, 95-cv-2952 (S.D.N.Y.) (settled 3/12/96, $35,000). Plaintiff arrested without probable cause; charges dismissed on People's motion eight months after arrest.

g.    *Nieves v. City of New York, et al.*, 94-cv-1491 (E.D.N.Y.) (settled 4/25/96, $50,000). Plaintiff, a security officer with the City's Department of Business Services with a Special Patrolman's license, was arrested without probable cause in baseless drug sweep, but never arraigned. Due to the incident, Plaintiff's employer revoked his license. An officer concocted a false story preventing Plaintiff from defending himself at a hearing pertaining to the revocation of his license.

h.    *Espinal v. City of New York, et al.*, 95-cv-9759 (S.D.N.Y.) (settled 6/7/96, $800,000). Plaintiff arrested without probable cause; police falsely testified before the grand jury; after plaintiff's guilty plea, conviction was vacated and the indictment was dismissed as procured by false and/or perjured testimony.

i.    *Victor v. City of New York, et al.*, 96-cv-243 (S.D.N.Y.) (settled 6/17/96, $725,000). Plaintiff arrested without probable cause; police falsely charged plaintiff and committed perjury in the grand jury; plaintiff's conviction was vacated and indictment dismissed.

29

j.    *Boland v. City of New York, et al.*, 93-cv-5058 (E.D.N.Y.) (settled 8/6/96, $30,000). Plaintiff arrested without probable cause; held in custody for two nights.

k.    *Taousse v. City of New York, et al.*, 95-cv-7965 (S.D.N.Y.) (settled 12/4/96, $16,000). Plaintiff arrested without probable cause and falsely charged with violating traffic laws; charges were dismissed.

l.    *Kadlub v. City of New York, et al.*, 95-cv-1080 (E.D.N.Y.) (settled 12/11/96, $34,000). Plaintiff arrested without probable cause on drug possession and sale charges.

m.    *Castro v. City of New York, et al.*, 94-cv-5114 (S.D.N.Y.) (settled 1/14/97, $72,500). Plaintiff arrested on weapons possession charges without probable cause; charges dropped after plaintiff was held in custody for several hours. Complaint alleged that NYPD officer responded to plaintiff's complaints about wrongful arrest by saying that he would not release her, but if the arrest were in error she could "always sue the City, [because] they got a lot of money."

n.    *Carthens v. City of New York, et al.*, 94-cv-8764 (S.D.N.Y.) (settled 3/18/97, $200,000). Plaintiff arrested without probable cause; police fabricated that plaintiff had dropped a bag that contained cocaine and a weapon; police swore to a Criminal Court complaint with false allegations.

o.    *Rojas v. City of New York, et al.*, 96-cv-8728 (S.D.N.Y.) (settled 3/31/97, $800,000). Plaintiff arrested without probable cause; police falsely charged plaintiff and testified falsely in the grand jury; plaintiff's conviction was vacated and indictment dismissed.

p.    *Frantino v. City of New York, et al.*, 96-cv-3725 (S.D.N.Y.) (settled 4/15/97, $50,000). Two plaintiffs arrested without probable cause and issued Desk Appearance Tickets; district attorney declined prosecution; parking summons issued by police dismissed for facial insufficiency.

q.    *McCaskill v. City of New York, et al.*, 96-cv-3687 (E.D.N.Y.) (settled 7/10/97, $100,000). Plaintiff arrested for disorderly conduct without probable cause.

r.    *Gurley v. City of New York, et al.*, 95-cv-2422 (E.D.N.Y.) (settled 8/21/97, $1,750,000). Conviction obtained in 1972 was vacated more than 20 years later based on prosecutor's withholding of exculpatory evidence, including an NYPD ballistics report. Complaint contained a malicious prosecution claim.

s.    *Sierzputowski, et al. v. City of New York, et al.* (E.D.N.Y.) (settled 12/1/97, $55,000). Two plaintiffs arrested without probable cause while driving a

rental car, despite producing proof of valid rental; plaintiffs in custody for 41 hours until arrests voided.

t.   *Howlen v. City of New York, et al.*, 97-cv-6544 (S.D.N.Y.) (settled 12/22/97, $200,000). Plaintiff arrested without probable cause; police swore to false complaint; police testified falsely during preliminary hearing and in the grand jury; police admitted to committing perjury in connection with plaintiff's case.

u.   *Tomback v. City of New York, et al.*, 96-cv-3972 (E.D.N.Y.) (settled 2/9/98, $20,000). Plaintiff arrested without probable cause; charges dismissed due to lack of evidence.

v.   *Gaylock, et al. v. City of New York, et al.*, 96-cv-6183 (E.D.N.Y.) (settled 3/6/98, $90,000). Plaintiffs arrested without probable cause on weapons charges, which were pending for 10 months before dismissal by court.

w.   *Sharp v. City of New York, et al.*, 97-cv-4236 (S.D.N.Y.) (settled 3/17/98, $55,000). Plaintiff arrested and strip-searched without probable cause; falsely charged; charges were subsequently dismissed.

x.   *Paster v. City of New York, et al.*, 95-cv-10316 (S.D.N.Y.) (settled 3/23/98, $115,000). Plaintiff arrested without probable cause; charges against him were dismissed.

y.   *Gager v. City of New York, et al.*, 97-cv-4718 (S.D.N.Y.) (settled 6/1/98, $105,000). Plaintiff issued false summonses for criminal trespass and disorderly conduct; charges dismissed on People's motion.

z.   *Marino v. City of New York, et al.*, 97-cv-9003 (S.D.N.Y.) (settled 6/4/98, $90,000). Plaintiff arrested and strip-searched without probable cause; released when district attorney declined to prosecute case.

aa.   *Bradley v. City of New York, et al.*, 97-cv-4076 (E.D.N.Y.) (settled 10/14/98, $20,000). Plaintiff ordered to pull car over without probable cause; falsely arrested based on outstanding Illinois warrant issued for a different person; and held in custody for three days despite evidence that she was not the person being sought by the warrant.

bb.   *Gordon v. City of New York, et al.*, 97-cv-8035 (S.D.N.Y.) (settled 11/12/98, $40,000). Plaintiff arrested without probable cause based on false allegations in felony complaint made by NYPD officers; charges dismissed by prosecutor three months after arrest.

cc.   *Perez v. City of New York, et al.*, 98-cv-2331 (S.D.N.Y.) (settled 1/16/99, $15,000). Plaintiff arrested without probable cause; charges dismissed by court approximately one month after arrest.

dd.   *Williams v. City of New York, et al.*, 98-cv-5917 (S.D.N.Y.) (settled 2/1/99, $300,000). Plaintiff arrested without probable cause for possessing controlled substance; police falsified evidence to effect unlawful arrest of plaintiff.

ee.   *Silver v. City of New York et al.*, 97-cv-5384 (E.D.N.Y.) (settled 3/2/99, $40,000). Plaintiff arrested without probable cause; charges were dropped approximately four months later.

ff.   *Ziehenni v. City of New York, et al.*, 98-cv-3763 (S.D.N.Y.) (settled 3/5/99, $55,000). Plaintiff arrested without probable cause; charges pending for 2 ½ months before they were dismissed by the court. Complaint alleged arrest was made in retaliation for plaintiff's prior CCRB complaint.

gg.   *Deluise v. City of New York, et al.*, 98-cv-4535 (S.D.N.Y.) (settled 3/18/99, $28,000). Plaintiff arrested without probable cause.

hh.   *Napoli v. City of New York, et al.*, 97-cv-1255 (E.D.N.Y.) (settled 4/9/99, $60,000). Plaintiff arrested and indicted on weapons possession and assault charges based on false testimony by NYPD officers in grand jury. Plaintiff acquitted approximately one year after arrest.

ii.   *Martinez v. City of New York, et al.*, 96-cv-289 (E.D.N.Y.) (settled 4/12/99, $50,000). Plaintiff assaulted and arrested without probable cause when police entered her apartment with a battering ram looking for her son.

jj.   *Jefferson v. City of New York, et al.*, 98-cv-1097 (E.D.N.Y.) (settled 4/14/99, $175,000). Plaintiff, a corrections officer, arrested on drug charges without probable cause; charges pending for 5 months before grand jury returned no true bill. Complaint alleged that NYPD officers failed to inform prosecutors of their knowledge of plaintiff's innocence during the prosecution.

kk.   *Dennis v. City of New York, et al.*, 98-cv-5355 (E.D.N.Y.) (settled 5/26/99, $15,000). Plaintiff threatened, assaulted, and arrested without probable cause; false charges filed against plaintiff.

ll.   *Denizard v. City of New York, et al.*, 98-cv-423 (E.D.N.Y.) (settled 6/4/99, $64,000). Plaintiff arrested without probable cause for disorderly conduct, resisting arrest. Charges dismissed on People's motion eight months after arrest.

mm.   *Sweazie v. City of New York, et al.*, 99-cv-419 (E.D.N.Y.) (settled 10/20/99, $20,000). Plaintiff arrested on weapons possession charges; prosecution continued based on NYPD officers' false statements in felony complaint.  Charges dismissed when grand jury voted no true bill.

32

nn.   *Davis v. City of New York, et al.*, 00-cv-387 (S.D.N.Y.) (settled 1/19/00, $175,000). Plaintiff arrested without probable cause; spent four months in jail before jury acquittal; during criminal trial, trial court found that plaintiff's arrest was "illegal and outrageous," that he was arrested solely because of his race, and that police took plaintiff's photo and showed it to the complainant unlawfully and without probable cause.

oo.   *Daniels v. City of New York, et al.*, 00-cv-1981 (S.D.N.Y.) (settled 3/15/00, $28,500). Plaintiff arrested without probable cause on weapons charges; charges dismissed by the court eight months after arrest.

pp.   *Mahase v. City of New York, et al.*, 96-cv-6105 (E.D.N.Y.) (settled 6/16/00, $75,000). Plaintiff arrested and detained without probable cause; charges dismissed on district attorney's motion due to lack of probable cause.

qq.   *Almonte v. City of New York, et al.*, 99-cv-519 (E.D.N.Y.) (settled 7/12/00, $30,000). Plaintiff arrested on drug sale charges without probable cause; indictment dismissed by the court one year, eight months after arrest.

rr.   *Fields v. City of New York, et al.*, 99-cv-8130 (E.D.N.Y.) (settled 7/28/00, $15,000). Plaintiff arrested without probable cause; prosecution continued for four months before dismissal by court.

ss.   *Lovell v. City of New York, et al.*, 00-cv-0002 (S.D.N.Y.) (settled 10/20/00, $40,000). Plaintiff arrested without probable cause for turnstile jumping based on false statements made by NYPD officer in criminal complaint.

tt.   *Golston v. City of New York, et al.*, 98-cv-4206 (E.D.N.Y.) (settled 10/26/00, $25,000). Plaintiff arrested on false charges of criminal harassment, which were dismissed after four months.

uu.   *Lindo v. City of New York, et al.*, 98-cv-9066 (S.D.N.Y.) (settled 11/21/00, $85,000). Plaintiff arrested without probable cause; police swore to false felony complaint; district attorney agreed to dismissal of charges.

vv.   *Cotto v. City of New York, et al.*, 00-cv-1341 (E.D.N.Y.) (settled 12/01/00, $30,000). Plaintiff arrested without probable cause; charges pending for one month before dismissal by the court.

ww.   *Coleman, et al. v. City of New York, et al.*, 00-cv-2019 (E.D.N.Y.) (settled 1/2/01, $60,000). Two plaintiffs arrested without probable cause; charges pending for 2 ½ months before dismissal. Complaint alleged that NYPD had policy, custom, and/or practice of arresting individuals without probable cause in lower income areas and areas with high reports of crime, which resulted in plaintiffs' false arrest and malicious prosecution.

33

xx.  *Udofia v. City of New York, et al.*, 00-cv-4872 (E.D.N.Y.) (settled 1/4/01, $30,000). Plaintiff arrested and detained without probable cause; was not prosecuted.

yy.  *Crespo v. City of New York, et al.*, 93-cv-8847 (S.D.N.Y.) (settled 8/29/06, $25,000). Plaintiff arrested without probable cause on weapons possession charges. Complaint alleged *Monell* claim based on the NYPD's "fostering [of] a policy to which perjury and the falsification of documents were methods of securing indictments and convictions of innocent individuals."

203.  Despite the City paying out the above settlements, the NYPD did not discipline any of these officers, thereby indicating condonation of the practice of arresting, and initiating prosecutions of, criminal suspects without probable cause and based upon false or misleading evidence.

204.  Evidence from more recent years shows that the NYPD's deliberate indifference to such constitutional violations by police officers persisted up to the time of Plaintiff's wrongful arrest and prosecution.

205.  In 2014, a court dismissed attempted murder charges against Tyrone Brown after an eyewitness who had viewed a lineup revealed that she had first picked out a filler, but then, after one of the NYPD detectives conducting the lineup sighed and told her to take her time, changed her answer and picked the defendant, which elicited a nod from the two detectives in the room. The witness revealed that, in fact, she still believed that the original person she picked was the shooter.

206.  The problem of "testilying" documented by the Mollen Commission Report has also been permitted, during the ensuing years, to continue to fester.

207.  In March 2018, just after Fabian Coke was convicted, the *New York Times* reported that there were "more than 25 occasions since January 2015" in which "judges or prosecutors determined that a key aspect of a New York City police officer's testimony was probably untrue." Joseph Goldstein, *'Testilying' by Police: A Stubborn Problem*, N.Y. Times,

Mar. 18, 2018, https://www.nytimes.com/2018/03/18/nyregion/testilying-police-perjury-new-york.html.

208. The article noted that these cases represented "almost certainly only a fraction" of the actual instances of testilying, since "a vast majority of cases end in plea deals before an officer is ever required to take the witness stand." *Id.*

209. A 10-year veteran of the NYPD, when interviewed by the *Times*, stated: "There's no fear of being caught . . . . You're not going to go to trial and nobody is going to be cross-examined." *Id.*

210. In a follow-up article, the *Times* reported that, out of 81 cases in which the Civilian Complaint Review Board ("CCRB") had found that an NYPD officer had made a false statement and the NYPD had reported some response to the finding, NYPD policymaking officials had disciplined officers in only two of the cases. *See* Joseph Goldstein, *Promotions, Not Punishments, for Officers Accused of Lying*, N.Y. Times, Mar. 19, 2018, https://www.nytimes.com/2018/03/19/nyregion/new-york-police-perjury-promotions.html.

211. The CCRB told the reporter that, in addition to these 81 cases, the CCRB had made findings of false statements in "dozens of other" cases, but the NYPD never even responded to these findings. *Id.*

212. Also in 2018, *BuzzFeed* reported that it had obtained NYPD files revealing that "from 2011 to 2015 at least 319 New York Police Department employees who committed offenses serious enough to merit firing were allowed to keep their jobs." Kendall Taggart & Mike Hayes, *Secret NYPD Files: Officers Who Lie and Brutally Beat People Can Keep Their Jobs*, BuzzFeed, Mar. 5, 2018, https://www.buzzfeednews.com/article/kendalltaggart/secret-nypd-files-hundreds-of-officers-committed-serious.

213.    At least 50 of these instances of misconduct involved officers making misleading or "inaccurate" statements in official records or to grand juries, district attorneys, or internal affairs investigators. *Id.*

214.    In every instance, NYPD policymaking officials who had "final authority in disciplinary decisions, assigned these officers to 'dismissal probation,' a penalty with few practical consequences." *Id.*

215.    A follow-up story by *BuzzFeed* reported that the City's Office of the Inspector General for the NYPD had prepared a report that "described how some officers escaped serious punishment for lying during investigations into their conduct," but in 2016, a City official prevented the report from being released publicly. Kendall Taggart, *The Former Top Official Overseeing the NYPD Inspector General Shelved a Report About Officers Who Lied*, BuzzFeed, Nov. 26, 2018, https://www.buzzfeednews.com/article/kendalltaggart/nypd-inspector-general-discipline-false-statements.

216.    The buried report documented instances in which NYPD "prosecutors overruled internal affairs investigations who recommended the officer be brought up on disciplinary charges." *Id.*

217.    Further illustrating the indifference of NYPD policymakers, around the time of Plaintiffs' wrongful arrest and conviction, to ensuring that police officers comply with the Constitution is the 2023 jury verdict in *Fraser v. City of New York*, No. 20-cv-4926 (S.D.N.Y.).

218.    In *Fraser*, a jury found the City liable under *Monell*, on the basis that the NYPD had a policy and practice of concealing information about lawsuits against police officers from criminal defendants in violation of *Brady*, thus causing Fraser's 2015 wrongful conviction.

36

219.    The jury in *Fraser* heard evidence that the NYPD had a comprehensive database of lawsuits against every officer but consciously decided not to use it to make sure that lawsuit information was disclosed to criminal defendants as required by *Brady*.

220.    The jury also saw training materials showing that the NYPD had adopted a written policy that exempted the lawsuit information from being disclosed even though a decision of the highest court in New York State had explicitly required such disclosure.

221.    In 2018, the *New York Times* reported that NYPD policymaking officials were withholding records of misconduct like that described above from the City's District Attorneys' Offices, thus further entrenching a culture in which NYPD officers were led to understand that they could violate the constitutional rights of criminal suspects with impunity. *See* James C. McKinley Jr., *Manhattan District Attorney Demands Access to Police Records*, N.Y. Times, July 8, 2018, https://www.nytimes.com/2018/07/08/nyregion/manhattan-district-attorney-police-records.html.

222.    In 2020, *ProPublica* similarly reported that the NYPD routinely refuses to provide the CCRB evidence that the law requires it to provide in order to facilitate the investigation of allegations of police misconduct, prompting a retired federal judge to observe, "This just seems like contempt." Eric Umansky & Mollie Simon, *The NYPD is Withholding Evidence from Investigations into Police Abuse*, ProPublica, Aug. 17, 2020, https://www.propublica.org/article/the-nypd-is-withholding-evidence-from-investigations-into-police-abuse.

223.    The article documented that when police officers refused to participate in remote interviews with CCRB investigators during the Covid-19 pandemic, "their superiors at the NYPD declined to step in." *Id.*

37

224.    The article reported that "the department's refusal to share evidence of its own officers' potential misconduct isn't an aberration. It's routine." *Id.*

225.    The New York City Law Department, a City agency, also has shielded NYPD officers from worrying about facing any consequences for their unconstitutional misconduct.

226.    In 2020, the City settled a lawsuit brought by Shuaib O'Neill, who had alleged that NYPD officers Joseph Cruzado, Kevin Matthews, and Jason Schleyer fabricated evidence that caused him to be wrongfully convicted of gun and drug offenses in 2010.

227.    In 2016, a New York appellate court had vacated O'Neill's convictions as being against the weight of the evidence and dismissed the indictment with prejudice, essentially finding that Cruzado's testimony was not credible.

228.    In so doing, the court had cited another case in which it had discredited Cruzado's testimony.

229.    When the Law Department attorney assigned to defend against O'Neill's lawsuit agreed on behalf of the City to settle the case, she insisted the settlement could go through only if O'Neill first dropped his individual claims against Cruzado and the other police officers and formally settled only with the City.

230.    Upon information and belief, the purpose of this maneuver was to avoid triggering rules that required remedial measures to be imposed on NYPD officers involved in civil settlements exceeding a certain dollar amount.

231.    Before the O'Neill settlement, the City had settled at least six other cases in which Cruzado was a defendant.

232.    Based on the above, NYPD policymaking officials knew or should have known, at the time of Plaintiff's prosecution, that NYPD employees, including Defendant Mullarkey,

were, among other things, manufacturing false or unreliable identification evidence, witness statements, and other evidence; initiating or continuing the prosecutions of criminal suspects despite lacking legitimate probable cause to believe such prosecutions would result in convictions; withholding or destroying material exculpatory or impeaching evidence; and knowingly giving false or misleading testimony.

233.    With deliberate indifference to such misconduct, NYPD policymaking officials failed to take adequate steps to train, supervise, or discipline NYPD employees to prevent or deter such constitutional violations from occurring.

234.    The NYPD's policy of deliberate indifference to and condonation of such constitutional violations directly, foreseeably, proximately, and substantially caused the violations of Plaintiff's federal constitutional rights in this case and his resulting injuries.

235.    By virtue of the foregoing, Defendant City of New York is liable for the violation of Plaintiff's constitutional rights pursuant to 42 U.S.C. § 1983 and Plaintiff's resulting injuries.

## **DEMAND FOR DAMAGES**

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

a.    compensatory damages for loss of liberty, past and future mental and emotional distress, and economic harm of not less than $30,000,000;

b.    punitive damages of not less than $10,000,000;

c.    reasonable attorneys' fees, together with costs and disbursements, under 42 U.S.C. § 1988, NY.C. Admin. Code § 8-805, and the inherent powers of this Court;

d.    pre-judgment interest as allowed by law; and

e.    such other and further relief as this Court may deem just and proper.

s/ Joel B. Rudin

JOEL B. RUDIN
Law Offices of Joel B. Rudin, P.C.
Carnegie Hall Tower
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600
jbrudin@rudinlaw.com

*Attorney for Plaintiff Fabian Coke*

Dated:    New York, New York
          December 15, 2025